IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| STANLEY L. NEWCOMB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:06-cv-181-DRH |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This matter has been referred to United States Magistrate Judge Donald G. Wilkerson by

United States District Judge David R. Herndon pursuant to 28 U.S.C. § 636(b)(1)(B), Federal

Rule of Civil Procedure 72(b), and Local Rule 72.1(a) for a Report and Recommendation on the

Petition for Review of the Commissioner's Decision Denying Benefits filed by Stanley L.

Newcomb ("Plaintiff") on March 1, 2006 (Doc. 1).  For the reasons set forth below, it is

**RECOMMENDED** that Plaintiff's petition be **GRANTED** only to the extent that it seeks a

remand to the ALJ for reconsideration of the benefits in light of the cervical and related

impairments discovered in August 2005**,** that the Commissioner's decision be **REVERSED**, that

this matter be **REMANDED** to the agency for further review consistent with this Court's order,

and that the Court adopt the following findings of fact and conclusions of law:

FINDINGS OF FACT

PROCEDURAL HISTORY

Plaintiff applied for Social Security Income ("SSI") on May 29, 2003 and Disability

Insurance Benefits ("DIB") on June 12, 2003 (Tr. 262), alleging an onset date of May 23, 2003

(Tr. 70-72).  His claim was initially denied on October 10, 2003 (Tr. 46-50), and upon review on

1

January 27, 2004 (Tr. 52-55).  Plaintiff requested a hearing before an Administrative Law Judge (ALJ), which was held on April 26, 2005 (Tr. 277-320).  After the hearing, the ALJ issued an unfavorable decision on July 21, 2005 (Tr. 26-39).  On January 6, 2006, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review (Tr. 6-9).

Plaintiff filed this suit in the U.S. District Court for the Southern District of Illinois on March 3, 2006 (Doc. 1).  Plaintiff argues that the ALJ's decision is not supported by substantial evidence, that the ALJ committed errors of law, and that a sentence-six remand is due because new and material information has been discovered that was not available to the ALJ at the time he rendered his decision.

## SUBSTANTIVE HISTORY

### Medical History

Plaintiff was 50 years old at the time of the ALJ's decision (Tr. 282) and had a tenth grade education (Tr. 285).  He had past work experience as a school bus driver, forklift driver, painter, groundskeeper, sandblaster, painter, laborer, and as a security guard (Tr. 115, 287-291).

On April 7, 2003, Plaintiff saw Dr. Shannon Rider, stating that he was injured three days earlier when a child jumped onto his back and neck while he was strapping another child into a school bus seat (Tr. 185).  He told Dr. Rider that he started having shooting pain down his left arm and neck on the next day (Tr. 185).  Dr. Rider observed that Plaintiff felt pain when he lifted his left arm (Tr. 185).  Dr. Rider prescribed Ibuprofen, Mobic, and physical therapy (Tr. 182-185).

Plaintiff saw Dr. Rider again on April 28, 2003, complaining of pain (Tr. 184).  Dr. Rider

gave Plaintiff a Celestone injection and indicated that Plaintiff would be able to go back to work on May 1, 2003 if most of his symptoms had resolved by then (Tr. 184). On May 8, 2003, Plaintiff complained to Dr. Rider of a continued burning pain that was shooting down his left arm (Tr. 184). Plaintiff told Dr. Rider that he had tried going back to work, but that the pain was intolerable (Tr. 184). Dr. Rider ordered an MRI, scheduled a follow-up appointment, and prescribed Mobic for the pain, and Skelaxin to relax the muscles (Tr. 184). The MRI results indicated a large disc bulge at C4-5 (Tr. 186). Dr. Rider reviewed the MRI and referred Plaintiff to a neurosurgeon (Tr. 183).

In May 2003, Plaintiff stated to Dr. Robert P. Meriwether, a neurologist, that he injured his back in April 2003 when a child jumped onto his back and he heard a popping sound (Tr. 164). Dr. Meriwether observed in a report that Plaintiff complained of pain after the incident despite physical therapy and a regime of medications including Mobic and Tramadol (Tr. 164). Dr. Meriwether also observed that a May 2003 MRI scan indicated a cervical disk herniation at C4-5 level (Tr. 164). Dr. Meriwether observed that Plaintiff had marked limitations in his movement (Tr. 164). Dr. Meriwether ordered a course of physical therapy and prescribed muscle relaxers and pain medications (Tr. 163).

In July 2003, two state agency physicians reviewed Plaintiff's medical history and opined that he retained the capacity to perform light work with limited left shoulder reaching and unlimited right shoulder reaching (Tr. 154-61).

On August 11, 2003, neurosurgeon Kevin Vaught, M.D., examined Plaintiff (Tr. 165-78). Dr. Vaught reviewed Plaintiff's medical history and, after conducting an extensive examination, diagnosed chronic neck, interscapular, left trapezium, and left should pain with no significant

3

improvement following conservative treatment (Tr. 169-70).  Dr. Vaught also observed that the

May 2003 MRI scan indicated spinal stenosis at C4-5 due to disc protrusion (Tr. 169.  Dr.

Vaught then ordered a cervical myelogram and a CT study (Tr. 169).

On September 11, 2003, Plaintiff saw Dr. Kee Park, a surgeon (Tr. 179-81).  Dr. Park

noted that the cervical myelogram and CT scan revealed severe stenosis at C4-5 and scheduled

Plaintiff for surgery, a discectomy (Tr. 180).  On September 16, 2003, Dr. Park performed a C4-

5 discectomy and fusion without complication (Tr. 192-93).  A month after the surgery, Dr. Park

noted that Plaintiff had reported no change in his symptoms and ordered him to stay off of work

(Tr. 181).

In December 2003, Plaintiff reported to Dr. Park that his left shoulder and arm pain had

completely resolved, but that he had persistent neck pain and intermittent arm weakness (Tr.

199).  Dr. Park then recommended that Plaintiff undergo physical therapy to improve his hand

strength (Tr. 199).

In January 2004, Dr. Julio Pardo reviewed Plaintiff's medical file, noting that the MRI

testing and limited range of shoulder movement confirmed the bulging neck disc (Tr. 146-53).

Dr. Pardo noted that the follow-up x-rays to the surgery indicated that the fusion was stable and

opined that Plaintiff would be able to perform light work eight months later around September

16, 2004 (Tr. 146).  A second physician, Dr. Kevin Pratt, agreed with Dr. Pardo's conclusions

(Tr. 153).

On February 9, 2004, Plaintiff stated to Dr. Park that his overall neck pain had improved

(Tr. 196).  Dr. Park then noted that a CAT scan showed maximum medical improvement and

released Plaintiff from care with no restrictions (Tr. 196).  However, in April 2004, Plaintiff

complained again of persistent neck and back pain (Tr. 194).  Dr. Park noted that the cervical x-rays showed maximum medical improvement and recommended cervical and lumbar myelogram testing to rule out persistent nerve root compression or hidden nerve root compression in the lower back (Tr. 194).

In May 2004, Plaintiff again saw Dr. Vaught, reporting no improvement of his neck and left arm symptoms since his September 2003 surgery (Tr. 187).  After an examination, Dr. Vaught concluded that the C4-5 level was normal, but that he should undergo another MRI to determine whether he needed surgery at any other disc levels (Tr. 190).  He indicated further that Plaintiff should undergo additional physical therapy and Electromyography/Nerve Condition Studies (Tr. 191).  Lastly, Dr. Vaught indicated that he did not feel Plaintiff had reached maximum medical improvement (Tr. 191).

From July 2004 through April 2005, Plaintiff sought periodic treatment from Dr. William Mutschler for complaints of neck and back pain and other problems (Tr. 203-27).  Dr. Mutschler completed a form to assist Plaintiff in securing a "disabled" hang tag for his vehicle (Tr. 228-30).

In June 2004, Plaintiff underwent a comprehensive mental health assessment, wherein he described depressive symptoms and suicidal ideation without intent (Tr. 231).  He also described his digging a fish pond as having provided him a physical outlet of anger against his son (Tr. 231).  Following the examination, Plaintiff was assessed with dysthymic disorder, post traumatic stress disorder, and polysubstance dependency (Tr. 238).  The examiner recommended individual and family counseling and case management (Tr. 240).

Plaintiff was seen by Dr. Rakesh Chandra during August 2004, September 2004, and January 2005 (Tr. 243-246).  During the August visit, he reported being depressed, angry, and

having difficulty sleeping (Tr. 245).  Following the examination, Dr. Chandra prescribed several

antidepressants (Tr. 245).  In the September 2004 visit, Dr. Chandra noted that Plaintiff's

depression was  improving with the antidepressants, refilled his prescriptions, and instructed him

to return in three months (Tr. 243).  In the January 2005 visit, Plaintiff stated that the

medications were working well with no side effects (Tr. 244).  Dr. Chandra observed that

Plaintiff's depressive disorder was in partial remission with medication and instructed him to

return in three months (Tr. 244).

Dr. Park saw Plaintiff on or about June 1, 2005 and reported that Plaintiff had "somehow

got lost in the shuffle." (Tr. 276).  Dr. Park explained further that the shuffle had prevented

Plaintiff from undergoing a diagnostic test (cervical myelogram) essential for determining the

cause of neck and arm pain he reported from April 2004 through June 2005 (Tr. 276).  Dr. Park

then re-ordered the myelogram, which he had previously ordered in April 2004 (Tr. 194, 276).

On August 31, 2005, the cervical myelogram indicated that Plaintiff had a disc herniation at C5-

6 and that this herniation was responsible for symptoms reported since April 2004 (Tr. 275).

**Hearing Testimony**

Both Plaintiff and a vocational expert, Dr. James Bordieri, testified at the hearing.  In

response to questions posed by the ALJ, Plaintiff testified that he had worked as a bus aide,

which entailed making sure children stayed seated, securing safety belts, helping maintain order,

helping children into and out of their wheelchairs, and helping children on and off the wheel lift

(Tr. 288).  Plaintiff testified that, prior to working as a bus aide, he worked as a technician in a

refinery, which entailed, among other things, operating a fork lift and changing catalysts (Tr.

289).  He also testified that he had worked as a groundskeeper, a painter, a cowboy, a security

guard, and a gate guard (Tr. 289-90).

He testified that he was injured during April 2003 by a child who had jumped on his back while he was strapping in a wheelchair (Tr. 285).  He further testified that he had only worked as a bus aide two times after April 2003 because he felt uncomfortable riding on the seats (Tr. 284). He testified that he had not been employed for wages since May 2003 and that he relied upon his mother and his son for subsistence and support (Tr. 286-87).  He testified that he had problems traveling because he could not sit straight or sit very long (Tr. 286).

Plaintiff testified to having surgery for his back in 2003 (Tr. 291).  He testified that he was still experiencing pain and a burning sensation from the base of his skull down his arm to his hip because of problems with the C4-5 disc, which was the disc treated during the operation (Tr. 291).  Plaintiff then testified that he did not have any mental issues (Tr. 291).

Next, Plaintiff testified that his surgeon, Dr. Park, told him he could go back to work in February 2004, but that he had not gone back to work despite that advice (Tr. 292).  He testified that no doctor had told him that his surgery had not been successful, but that at least one doctor had unsuccessfully tried to get a nerve reduction study done (Tr. 292).  Plaintiff testified that, although the results did not appear in his medical record, he had two CAT scans since the surgery (Tr. 292).  Plaintiff then testified that, although his medical record omitted much of the history regarding his mental health status, he had been seeing a doctor for mental health issues for about a year (Tr. 293).  He also testified that he had forgotten to tell his attorney that he was seeing a mental health counselor (Tr. 293, 299).

Plaintiff next testified that he had been experiencing pain in his neck, shoulder, and hip (Tr. 295).  He testified that he was in pain during the hearing that registered as a 10 on a scale

7

from 1 to 10 with 10 being the worst pain (Tr. 295).  He testified that he had already taken 4 Lortabs on the morning of the hearing and that the Lortabs sometimes made him dizzy and temporarily lose his vision (Tr. 296).  He testified that the Lortabs did not fully relieve his pain, but that he had taken the maximum daily dosage in anticipation of the pain he would experience while having to remain seated at the hearing (Tr. 296).

Next, Plaintiff testified that he could walk about 60 to 80 feet and stand for 15 to 30 minutes (Tr. 297).  He testified further that he could not bend, stoop, or squat (Tr. 297).  He next testified that he was right-handed, could not make a fist with his left hand, and had only partial feeling in that hand (Tr. 297-98).  He testified that his son helped him get dressed, bathe, and groom himself (Tr. 298, 301).  He also testified that his son and his wife did most of the cooking while he could use the microwave and make sandwiches on his own (Tr. 301).  He further testified that he could lift about the weight of a gallon of milk and that he could not sit more than 5 or 10 minutes (Tr. 298).

When the ALJ asked Plaintiff whether he had a mental problem, Plaintiff answered that he would get very angry with himself for not living up to his own expectations as a self-reliant person and a provider for his family (Tr. 299).  He said that he talked to a counselor roughly twice a month about the anger, which helped to relieve it until the next bout (Tr. 299).  He testified that he did not watch much television, got nervous and fidgety in crowds of four or more people, and could not deal with strangers (Tr. 299).  He acknowledged that no information about mental health treatment was in his medical file because he had not told his lawyer about that treatment (Tr. 299-300).

Plaintiff next testified that he had difficulty breathing, and that the difficulty increased

while walking or while in enclosed rooms with poor circulation (Tr. 300).  He testified to smoking a half-a-pack of cigarettes a day, wearing glasses to read, and having reduced hearing in his right ear (Tr. 301).  He testified that he only slept an hour to an hour-and-a-half every night, and took Trazadone as a sleeping medication (Tr. 301).  He testified that he got up on most mornings between 4:30 a.m. and 5:00 a.m., that he would try to take a walk and sit on the porch in any kind of weather (Tr. 302).  He further testified that he walked with his dog and fed her, but that he could not refill her water bowl because he could not lift the bowl (Tr. 303).  He testified that he had the hobbies of collecting fish and coins (Tr. 303).  He testified that he gave up the hobbies of motorcycle riding, horseback riding, swimming, walking through the park, sightseeing, and camera shooting (Tr. 304).  He testified that he had gone fishing three months prior to the hearing and that he fished from the bank and not in a boat on that occasion (Tr. 304).  Plaintiff also testified that he did not do chores anymore because of problems with his arm going stiff and his leg giving out (Tr. 304).  He testified that his son and daughter-in-law did the laundry and grocery shopping (Tr. 305).

He further testified that his friends would sometimes come to visit him and they would play cards, read books, go for a 15-minute ride in a car, or just sit there and talk (Tr. 305-06).  He also testified that he would sometimes have his grandchildren over to his house and that the 14-year old would help him look after the younger ones (Tr. 306).  He also testified that he did not have a driver's license and that he did not want to obtain one due to his belief that it would be irresponsible for him to drive with his vision troubles and while taking certain medications (Tr. 318).   In response to questions posed by his attorney, Plaintiff testified that a doctor had advised him to lose weight and that the doctor did not cite his weight as a contributing factor to the back

pain (Tr. 308).  He also testified that he used to lift between 200 and 300 pounds while working at the fuel refinery (Tr. 308).  He testified further that he had been scheduled to undergo surgery to remove his gall bladder about a month prior to the hearing, but that the surgery had been postponed to a time after the hearing because of his high blood pressure (Tr. 309).

He testified that during his therapy sessions for mental health, he talked about current events, family problems, and his intellectual and recreational interests (Tr. 310).  He also testified that sometimes the therapist and he attempted cross word games (Tr. 310).  He testified that he sometimes lost feeling in his left arm and it went cold (Tr. 310).  He testified further that Dr. Mutschler described it as neuropraxia, but that the nerve conduction study that he recommended for it had not been administered as of the date of the hearing (Tr. 310).  Plaintiff also testified as to having had surgery on his legs in 2002 (Tr. 311).  He testified that he experienced bouts of leg swelling since the surgery (Tr. 311).

Plaintiff testified that his inability to get along with people coupled with his pain level made it difficult to keep a regular, physically non-demanding job (Tr. 311).  He testified further that the discectomy surgery had not helped his pain and that Dr. Park neglected to note his constant post-surgery complaints of a roar in his forehead (Tr. 311-12).

In response to questions posed by the ALJ, Vocational Expert Dr. Bordieri testified that Plaintiff's past work as a bus aide as well as his past work as a security guard were classified as light, unskilled work (Tr. 313-14).  He classified Plaintiff's work at the refinery as heavy to very heavy, semi-skilled work (Tr. 313).  Dr. Bordieri then testified that Plaintiff could perform his past work as a bus aide or security guard, but that he would not be able to maintain any job in the light, unskilled category if his history of substance abuse made him unable to maintain attention

and concentration to perform simple tasks (Tr. 314).  He also testified that Plaintiff would not be able to maintain employment in any of his past work if he could not lift at the sedentary exertional level, stand, walk or sit sufficient to complete an eight-hour workday (Tr. 315).  He then testified that, in the absence of those limitations, 42,000 cashier positions, 22,000 assembler positions, and 7,500 packing/hand packaging positions were present in the region at the time of the hearing (Tr. 316).

In response to questions posed by Plaintiff's attorney, Dr. Bordieri testified that most security guard jobs entailing a driving run to check on the grounds required a driver's license (Tr. 316).  He also testified that bus aide positions involving the assistance of children with disabilities require the worker to be able to bend more than occasionally (Tr. 317).  He testified further that carpel tunnel in a worker's left hand would have the greatest impact in the assembly and hand packaging positions (Tr. 317).  Lastly, Dr. Bordieri testified that cashier work required a significant amount of standing and required also that the worker stay at the cash register station (Tr. 318).

At the close of testimony, Plaintiff's attorney requested, and the ALJ granted, additional time to supplement the medical history (Tr. 319).

**The ALJ's Findings and Conclusions**

Pursuant to Step 1 of the five-step sequential evaluation, the ALJ found that claimant was not engaged in substantial gainful activity (Tr. 30).  In Step 2, the ALJ found that Plaintiff had a severe disability (Tr. 30).  In Step 3, the ALJ found that Plaintiff's impairment did not meet or equal a listed impairment in Appendix I (Tr. 32).  The ALJ found in Step 4 that Plaintiff's impairments would not prevent him from performing his past relevant work as a security guard

11

and a bus aide, but the fact that he did not have a driver's license would limit his ability to obtain those jobs (Tr. 36).  In the fifth and final step, the ALJ found that Plaintiff could perform work at the light, unskilled level and that over 70,000 jobs at that level existed in the regional economy (Tr. 38).  Pursuant to the foregoing evaluation, the ALJ found that Plaintiff was not under a disability and was thus ineligible for SSI or DIB.

### CONCLUSIONS OF LAW

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act ("Act") is limited to a determination of whether those findings are supported by substantial evidence. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive[.]"); Golembiewski v. Barnhart, 322 F.3d 912, 915 (7th Cir. 2005) (stating that "the reviewing court is not allowed to substitute its judgment for the ALJ's by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility"). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1972) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 101 (1938)).  See also Sims v. Barnhart, 309 F.3d 424, 428 (7th Cir. 2002); Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. See Golembiewski, 322 F.3d at 915; Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000).  This deferential standard applies to credibility findings as well as RFC findings. Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001) ("The ALJ's credibility determinations generally will not be overturned unless they were patently wrong.").  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." Lopez ex.

rel. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003); Carradine v. Barnhart, 360 F.3d 751,

756 (7th Cir. 2004) (stating that "an administrative agency's decision cannot be upheld when the

reasoning process employed by the decision maker exhibits deep logical flaws").

Supplemental insurance benefits are available only to those individuals who can establish

"disability" under the terms of the Act.  The claimant must show that she is unable "to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Social

Security regulations enumerate the five-step sequential evaluation to be followed when

determining whether a claimant has met the burden of establishing disability. 20 C.F.R. §

416.920.  The ALJ first considers whether the claimant is presently employed or "engaged in

substantial gainful activity." 20 C.F.R. § 416.920(c).  If he is, the claimant is not disabled and the

evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe

impairment or combination of impairments which "significantly limits ... physical or mental

ability to do basic work activities." 20 C.F.R. § 416.920(c).  Third, the ALJ determines whether

that severe impairment meets any of the impairments listed in Appendix 1, Subpart P, Regulation

No. 4 ("Appendix 1"). 20 C.F.R. § 401, pt. 404, subpt. P, app. 1.  If it does, then the

Commissioner acknowledges that the impairment is conclusively disabling.  However, if the

impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the

claimant's "residual functional capacity" ("RFC") and the physical and mental demands of her

past work.  If, at this fourth step, the claimant can perform her past relevant work, she will be

found not disabled. 20 C.F.R. § 416.920(e).  However, if the claimant shows that her impairment

is so severe that she is unable to engage in past relevant work, then the burden of proof shifts to

the Commissioner to establish that the claimant, in light of her age, education, job experience

13

and functional capacity to work, is capable of performing other work and that such work exists
in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(f).

Plaintiff's first argument is that the ALJ committed an error of law at Step 4 when he
relied upon opinions of state agency physicians in assessing Plaintiff's RFC although those
physicians rendered their opinions prior to, and thus without consideration of, Dr. Park's April
2004 examination and Dr. Mutschler's numerous reports dating from August 2004 through April
2005.  Plaintiff cites Frankl v. Shalala, 47 F.3d 935 (8th Cir. 1995) in support of the proposition
that the ALJ erred by relying upon a non-examining physician's RFC when it was completed
more than a year prior to the hearing and was not based upon the full record.  The Commissioner
responds that, in addition to the reviewing doctors' assessments, the ALJ also relied upon other
substantial evidence in the record to support his RFC finding, including the very evidence that
was unavailable at the time the state agency doctors performed their RFC assessments.

In determining a claimant's RFC, an ALJ must consider "all of the relevant medical and
*other evidence*," including the claimant's own descriptions and observations of his limitations.
20 C.F.R. § 404.1545(a)(3) (emphasis added).  Such other evidence for the ALJ's consideration
includes: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of
pain and symptoms; (3) factors that precipitate and aggravate the claimant's symptoms; (4) the
type, dosage, and effectiveness of medications; (5) the claimant's treatment other than
medication; (6) any measures the claimant has used to relieve his pain or symptoms; and (7)
other factors concerning the claimants functional limitations and restrictions due to pain or other
symptoms. 20 C.F.R. § 404.1529(c)(3); Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995).

Although the ALJ here did consider as a factor the RFC opinions of state agency doctors,
he also supported his RFC finding by citing numerous other factors that influenced his
reasoning, including the following: (1) Plaintiff continued the hobby of fishing and even dug a

14

fishpond following his spine surgery, which suggests that his arm pain and neck pain was not so debilitating as to prevent him from the rigorous bodily exertion involved in shoveling earth; (2) Plaintiff's treating physicians prescribed mild pain relief medications in response to his complaints of pain, which suggests that his pain was not so severe as to preclude light work; (3) Plaintiff's treating physicians did not recommend ongoing physical therapy or injections, which also suggests that his pain was not so severe as to preclude light work; and (4) Plaintiff's testimony describing his post-surgery pain and limitations went far beyond the descriptions of pain he offered his treating physicians and mental health professionals, which undermined the credibility of his testimony about the impact of pain on his capacity to perform daily and work-related tasks.  The ALJ had a duty to consider these other factors in conjunction with the observations of the non-treating physicians in determining Plaintiff's RFC. Id.  Because the ALJ considered appropriate other factors, citing evidence in support from the medical record and hearing testimony, the Court sees no reason to disturb his RFC finding that Plaintiff can perform light work. See Ellis v. Barnhart, 384 F.Supp.2d 1195, 1203 (affirming an ALJ's RFC conclusion when it conflicted with the treating physician's assessment but was supported by other evidence in the record).

Further, the ALJ incorporated into his discussion of the above factors a discussion of the medical evidence that was not available to the agency physicians at the time of their assessments, including the April 2004 cervical x-rays and the numerous reports of Dr. Mutschler indicating Plaintiff's constant complaints of neck pain.  However, the ALJ found that the x-rays indicated maximum medical improvement despite Plaintiff's complaints of pain and that Dr. Mutschler's reports were of no evidentiary value because they were not corroborated by medical evidence of record and appeared to be based entirely upon Plaintiff's self-reports. See Dixon v. Massanari,

270 F.3d 1171, 1178 ("An ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations."). Pursuant to the foregoing discussion, the ALJ did not err in his partial reliance upon the assessments of agency doctors.

Plaintiff's second argument is that the ALJ erred in fashioning an RFC without first assessing each of the seven strength functions set forth in Social Security Regulations ("SSR") 96-8p. Plaintiff is correct that the Commissioner's regulations require a function-by-function assessment of the affect that functional limitations might have upon work-related abilities. See SSR 96-8p ("The RFC must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis[.]"). However, Plaintiff mistakenly assumes that the regulations require any assessment of impairments that are not supported by medical evidence. SSR 96-8p holds in relevant part:

> The Act requires that an individual's inability to work must result from the individual's physical or mental impairment(s). **Therefore, in assessing RFC, the adjudicator must consider only limitations and restrictions attributable to medically determinable impairments. It is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s).**

SSR 96-8p (emphasis added). Under the Act, a medically determinable impairment is defined as an anatomical, physiological, or psychological abnormality that "can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508 ("A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms."). Pursuant to the foregoing provisions, SSR 96-8p does not require an ALJ to assess medical impairments that are not supported by clinical and diagnostic techniques, or by a diagnosis that was not properly derived from those techniques and was based only upon a claimant's self-reports of symptoms.

16

Because the record was devoid of medical evidence of impairments to Plaintiff's left arm or hand,[1] and because the ALJ found Plaintiff's testimony about his arm and hand pain less than entirely credible, the ALJ here had no obligation to conduct an assessment of how such an impairment might have hypothetically affected Plaintiff's ability to do work-related tasks. Therefore, Plaintiff's second argument that the ALJ committed an error of law by not conducting a function-by-function analysis is without merit.

Plaintiff next argues, pursuant to Wilder v. Chater, 64 F.3d 335 (7th Cir. 1995), that the ALJ erred by determining in Step 3 that Plaintiff's mental impairments did not meet one of the listed impairments in Appendix 1 without the input from an agency or other psychologist.  More specifically, Plaintiff asserts that the ALJ lacked the expertise to find a mild limitation of social function after considering Plaintiff's violent past and six prior marriages.  Additionally, Plaintiff asserts, citing Young v. Barnhart, 362 F.3d 995 (7th Cir. 2004), that the ALJ erred by failing to assess Plaintiff's RFC after finding a severe mental impairment.  However, Plaintiff's argument is unpersuasive here because he relies for support upon case law that does not support the propositions of law he advances,[2] and because he has fails to show that the ALJ did not perform the RFC after finding the severe mental impairment.  The deficiency of this argument is discussed at length below.

Turning first to the question of whether the ALJ failed to consult a physician prior to

---

[1]Plaintiff urges the Court to consider statements in Dr. Vaught's May 2005 report as an indication that Plaintiff had the impairment of carpal tunnel syndrome.  However, no diagnostic testing was ever done to establish such an impairment.

[2]The Court notes that Plaintiff's reliance upon Young is unavailing as it does not stand for the proposition that an ALJ commits an error by failing to perform a mental RFC after finding a severe mental impairment. The Court acknowledges, however, that such a proposition would be entirely consistent with the requirement that an ALJ determine an RFC at Step 4.  Nonetheless, that proposition, if taken as true, does not aid Plaintiff here because, as explained below, he has failed to show that the ALJ omitted the required mental RFC assessment.

performing Step 3, the Court's careful reading of the <u>Wilder</u> opinion indicates that it does not stand for the proposition that an ALJ may not determine from the medical evidence of record whether a severe mental impairment meets or equals one of the listings in Appendix 1. 64 F.3d at 337 (finding that an ALJ erred when he gave too little weight to the opinion of a medical expert as to a claimant's mental impairment).  Likewise, the Court is aware of no case law calling for an ALJ to obtain a physician's opinion as to whether an already established impairment actually meets or equals one of the Appendix 1 listings.  Indeed, there is no apparent basis in law or logic to disturb the ALJ's Step 3 finding on the grounds that he failed to consult a physician about whether the mental impairment met the Appendix 1 listings.  Plaintiff's foregoing argument is without merit.

With respect to Plaintiff's argument that the ALJ failed to assess a mental RFC after finding a severe mental impairment, the Court observes that the ALJ did assess RFC when he concluded that Plaintiff was capable of performing simple, routine tasks (Tr. 36).  The ALJ reached that conclusion after considering the observations of Plaintiff's mental health providers and after finding that Plaintiff's testimony as to his mental limitations was questionable (Tr. 36-36).  Accordingly, the ALJ assessed only Plaintiff's medically determinable impairments before concluding that the limitation primarily affected his ability to concentrate and finding that Plaintiff's mental RFC limits him to the performance to simple, routine tasks.  This conclusion of the ALJ must stand because it is based upon "such relevant evidence as a reasonable mind might accept to support such a conclusion." <u>Richardson</u>, 402 U.S. at 401.  Plaintiff's foregoing argument is without merit because, contrary to averments to the contrary, the ALJ did not omit the RFC assessment.

Plaintiff next argues that the ALJ erred in finding his testimony not completely credible.

18

As previously set forth in this document, the credibility findings of an ALJ are afforded great deference and will not be disturbed unless they are "patently wrong." Zurawski, 245 F.3d at 887. Plaintiff avers that the ALJ's credibility finding was patently wrong because he based it upon mistaken belief that Plaintiff testified to constantly severe pain. Plaintiff also avers that the ALJ was unqualified to conclude that Plaintiff's prescription for Lortabs indicated less than severe pain. For reasons discussed in depth below, neither of these credibility findings are patently wrong.

To be sure, when making a determination of the intensity and severity of pain, the ALJ was required to consider, among other things, the types of medication treating physicians have prescribed Plaintiff for pain relief. Zurawski, 245 F.3d at 887 ("Factors that must be considered include **the nature and intensity of claimant's pain**, precipitation and aggravating factors, **dosage and effectiveness of any pain medications**, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities.) (emphasis added); see also SSR 88-13 (requiring the ALJ to consider, *inter alia*, the type, dosage, effectiveness, and side-effects of any pain medication in developing evidence of pain and other symptoms). After considering those factors, the ALJ found that Plaintiff's activity of digging a fish pond was inconsistent with severe pain. Thus, the ALJ's finding that the pain was not severe was based upon evidence in the record other than Plaintiff's testimony. In other words, even if the Court were to assume, arguendo, that the ALJ mistakenly construed Plaintiff's statements as attesting to constantly severe pain, sufficient and substantial other evidence, including the pond-digging activity, supports the ALJ's finding that severe pain was neither constant nor severe. Similarly, the discussion of Plaintiff's pain prescriptions is particularly unassailable because the Commissioner's regulations require the ALJ to consider the type, dosage, effectiveness of any

pain medications in developing evidence of pain and symptoms. Id.  It would be nonsensical to penalize the ALJ for his consideration of factors that the regulations required him to consider. Therefore, the Court rejects the argument that the ALJ erred in finding Plaintiff's testimony not entirely credible by misconstruing his testimony and that the ALJ erred by considering the mildness of Lortabs in assessing the severity of Plaintiff's self-reported pain.

Last, Plaintiff argues that this case should be remanded back to the Commissioner for reconsideration of the benefits claim in light of the August 2005 discovery that Plaintiff had a herniated C5-6 disc.  Plaintiff avers that the remand would be appropriate pursuant to 42 U.S.C. § 405(g) because medical evidence of the herniated disc was not available for the ALJ's consideration at the time of his decision, because there is a reasonable probability that the ALJ would have reached a different conclusion had he considered this evidence, and that because Plaintiff's doctors were confused about the type of testing Plaintiff was to undergo in assessing the cause of his symptoms, good cause exists for Plaintiff's failure to incorporate the test results into the record in the prior proceeding.  The Commissioner argues in response that although the evidence is new, it is not material because it relates to an injury that occurred after Plaintiff's onset date of May 23, 2003.  In light of this fact, the Commissioner argues that the injury, if known to the ALJ at the time of the hearing, would not have affected his decision because there is no conclusive proof that the injury existed at the time of the hearing.  In support of that argument, the Commissioner cites Godsey v. Bowen, 832 F.2d 443 (7th Cir. 1987) for the proposition that a claimant's only avenue of relief is to reapply for benefits when evidence presented after the ALJ's decision documents a new, unrelated injury, or a worsening of that claimant's condition.  The Commissioner does not deny, however, that good cause exists for Plaintiff's failure to provide the new information in the prior proceeding.

A reviewing court may order additional evidence to be taken before the Commissioner, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); Perkins v. Chater, 107 F.3d 1290, 1296 (7th Cir. 1997). Such an order of a reviewing court is commonly referred to as a "sentence six remand." Perkins, 107 F.3d at 1296. Pursuant to the statute, evidence is considered "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." Id. New evidence is "material" if "there is a reasonable probability that the [ALJ] would have reached a different conclusion had the evidence been considered[.]" Id.

Because the Commissioner does not dispute that the material is new and that good cause exists for Plaintiff's failure to submit it prior to the hearing, the Court need only determine whether the evidence of a herniated C5-6 disc is material. There is no merit to the Commissioner's argument that the Godsey opinion, by analogy, deems Plaintiff's new evidence immaterial under 42 U.S.C. § 405(g). In Godsey, the Seventh Circuit Court of Appeals considered whether evidence that a claimant's condition deteriorated after an ALJ's decision was material for the purposes of a sentence six remand. 832 F.2d at 445. The court there concluded that such evidence was not material. Id. The instant case, however, presents a different question, to wit: Is evidence of an injury occurring after 2003 material to proceedings held in April 2005 when there is no conclusive proof that the injury occurred prior to the hearing? The answer is yes.

While there may be no conclusive proof that Plaintiff's C5-6 injury occurred prior to the 2005 hearing, the proper standard for determining materiality focuses on what the ALJ would have done with the evidence if it had been available at the time he reached his conclusion. The

21

ALJ here rendered his decision in July 2005, whereby Dr. Park corrected the confusion as to Plaintiff's impairments in a report dated June 1, 2005.  The Court, imputing diligence to the ALJ, finds it reasonably probable that he would have postponed his July decision if he had learned in June that an error on the part of Plaintiff's physicians had allowed a severe impairment to have gone undetected and thus undocumented in the medical record.  In light of Dr. Park's August 2005 report confirming the mixup, such a postponement would have promoted the ALJ's interests in rendering a valid decision based upon medically determinable impairments and substantial evidence.  The postponement would have also promoted goals of judicial economy considering that it would have precluded this Court from confronting the question of whether the new information justified a sentence six remand.  In sum, the Court has every reason to conclude that the ALJ would have, at the very least, postponed his decision to allow Plaintiff to supplement the record.  The policy considerations alone are persuasive on the question. Nonetheless, as the Court explains below, it is reasonably probable that the ALJ would have made different findings of pain, credibility, and RFC if he had known of the herniation at the time of his decision.

The ALJ would have inevitably made different findings of credibility, pain, and RFC if he had known of the herniated disc at C5-6 during the hearing and prior to rendering his decision.  To be sure, the ALJ based much of his findings upon the fact that the record he examined presented no proof of a medically determinable impairment accounting for Plaintiff's complaints of severe pain in his neck and left arm.  However, the new information provides the following clarity: (1) Plaintiff's C5-6 herniation occurred after his surgery to treat the C4-5 herniation; (2) Plaintiff's doctors failed to conduct the proper testing in response to his reports of pain, thus they failed to detect and report the C5-6 herniation prior to the hearing; (3) Dr.

Mutschler's numerous reports that Plaintiff complained of neck and arm pain corresponds closely with the fact that he suffered from an undiagnosed cervical spine injury; (4) Plaintiff's testimony as to the severity of his pain and the ineffectiveness of the Lortabs is more credible in light of the new medical information; (5) The fact that treating physicians had not recommended more physical therapy and pain relief treatments can be attributed to their obliviousness to the presence of the C5-6 herniation; and (6) Plaintiff's RFC was assessed without reference to the symptoms associated with a disc herniation and thus without consideration of how those symptoms would have affected his ability to perform certain functional demands.

A sentence six remand does not assign blame to the ALJ; it only finds that he would have probably reached different conclusions if the new, material information had been available to him between the time of the hearing and the time of his decision.  The ALJ's July 2005 decision was based upon substantial evidence, and he committed no errors of law in reaching that decision.  However, in light of the way the new evidence necessarily undermines the external validity of that decision, the Court finds it reasonably probable that he would have reached a different conclusion if he had known about the C5-6 herniation.  As such, a remand pursuant to 42 U.S.C. § 405(g) is warranted so that the ALJ may render a decision incorporating a discussion of how the Plaintiff's newly discovered impairments affect his eligibility for benefits available under the Act.

Because new, material evidence exists that Plaintiff, for good cause, failed to produce at the time of the hearing, it is **RECOMMENDED** that Plaintiff's petition be **GRANTED** only to the extent that it seeks a remand to the ALJ for reconsideration of the benefits in light of the cervical and related impairments discovered in June 2005**,** that the Commissioner's decision be **REVERSED**, that this matter be **REMANDED** to the agency for further review consistent with

this Court's order, and that the Court adopt the foregoing findings of fact and conclusions of law.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1(b), the parties shall have ten (10) days after service of this Recommendation to file written objections thereto.  The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. Snyder v. Nolen, 380 F.3d 279, 284 (7th Cir. 2004); United States v. Hernandez-Rivas, 348 F.3d 595, 598 (7th Cir. 2003).

**DATED: August 14, 2007**

s/ Donald G. Wilkerson
**DONALD G. WILKERSON**
**United States Magistrate Judge**